UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Civil Action |
| ex rel. DAVID FRANKLIN, | ) | No. 96-11651-PBS |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PARKE-DAVIS, DIVISION OF | ) | |
| WARNER-LAMBERT COMPANY | ) | |

## RELATOR'S OPPOSITION TO MOTION TO DISMISS

Through Medicaid, the Veteran's Administration and the Public Health Service, the United States Government either subsidizes or directly purchases billions of dollars of prescription drugs. Given this huge expenditure, it is not surprising that federal statutes and regulations restrict the drugs and drug uses for which Medicaid and other federal programs will provide reimbursement. Among other restrictions, Medicaid will not pay for prescription drugs when they are prescribed for uses that have not been proven to be safe and effective by the Food and Drug Administration or recognized drug compendia. 42 U.S.C.A. §§ 1396b(i)(10), 1396r-8(k)(2), (3) (West 1992 & Supp. 2000). In short, the federal government will not pay for *off-label* uses of prescription drugs unless prescribed for a "medically accepted indication."

In this case, Relator David Franklin alleges that Defendant Parke-Davis knowingly caused physicians to write *off-label* prescriptions for two of its drugs, Neurontin and Accupril, and that such actions led to thousands of false claims being filed under federal programs. The false claims were principally requests for Medicaid reimbursement for Neurontin and Accupril, prescriptions that were not for a "medically accepted indication" under the Medicaid statutes, and Parke-Davis knew its actions were illegal when it unlawfully marketed the *off-label* uses to

Medicaid providers. Additionally, false statements were made to Veteran's Hospital doctors to induce the government to purchase these drugs directly from Parke-Davis. Given that Relator can, and has, provided extensive evidence of Parke-Davis's illegal scheme, and that the Defendant's wrongful acts led to the United States' improper payment of claims, Relator can plainly state a cause of action and Defendant's Motion to Dismiss must be denied.

## BACKGROUND FACTS AND STATUTORY SCHEMES

### A.    Federal Reimbursement Is Not Available For *Off-Label* Drug Uses Unless Prescribed For A "Medically Accepted Indication"

New pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor of the drug has demonstrated to the satisfaction of the United States Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 335(d). Once a drug has been approved for any use, doctors bold enough to risk malpractice suits are free to prescribe such drugs for any use, but drug manufacturers are restricted in marketing or promoting a drug for a use that the FDA did not approve. *Washington Legal Foundation v. Henney,* 202 F.3d 331, 333, (D.C. Cir. 2000). A drug is "misbranded" under the Food Drug and Cosmetic Act if its "labeling" (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. *See* 21 U.S.C. § 352; *Washington Legal Foundation v. Friedman,* 13 F. Supp. 2d. 51, 55 (D.D.C. 1998) *vacated in part, Washington Legal Foundation v. Henney,* 202 F.3d 331 (D.C. Cir. 2000). The Food and Drug laws require a manufacturer to resubmit the drug for another series of clinical tests and FDA approval if the manufacturer intends to market or promote the drug for an unlabeled use. *Id.*

The Food and Drug laws' restrictions regarding drug manufacturers' promotion of *off-label*[1] uses is critical in assuring that drugs are safely and effectively used. To allow such promotion sabotages the regulatory scheme established by Congress. A drug company can obtain approval of a new drug for a marginal use, and then heavily promote the pharmaceutical for uses that have never been proven to be safe or effective. It can then charge monopoly profits while avoiding the cost and burden of conducting the clinical trials necessary to establish whether the drug actually delivers its promised benefits. As the FDA has stated:

> Promotion of unapproved uses can encourage physicians and patients to make decisions based on statements or claims that are in many cases supported by little or no data. Thus, FDA's position is that the promotion of unapproved uses, either by companies or other parties that benefit by the promotion, can place physicians and patients in positions where they cannot make an informed, unbiased decision. It can also decrease the incentive of sponsors to conduct the well-controlled clinical investigations that are necessary to demonstrate whether the products are safe and effective for their intended uses. Without well-controlled trials, physicians will not have the information needed to optimally use the product.

*Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices,* 59 Fed. Reg. 59,821, 59,822 (1994).

Medicaid subsidizes the purchase of more prescription drugs than any other program in the United States. It is not surprising, then, that Congress specifically mandated that federal Medicaid funds could not be used to subsidize the purchase of prescription drugs unless the prescribed use was for a "medically acceptable indication." Section 1927 of the Social Security Act, 42 U.S.C. § 1396r-8, restricts the outpatient prescription drugs that the federal government will pay for through its funding of state Medicaid programs. With one narrow exception, where a drug is deemed "essential" to the health of the beneficiary,[2] the federal government will only

---

[1] *Off-label* is defined to include treating a condition not indicated on the label or treating the indicated condition but altering the dosage or patient population.

[2] Section 1396r-8(a)(3) allows payment to be made for a drug not otherwise covered provided the drug is rated 1-A by the FDA and has been determined to be "essential to the health of beneficiaries under the State plan,"

pay for "covered outpatient drugs," 42 U.S.C. § 1396b(i)(10), which is defined, *inter alia,* to exclude drugs "used for a medical indication which is not a medically accepted indication." § 1396r-8(k)(3). A "medically accepted indication" is any drug use "which is approved under the Federal Food Drug and Cosmetic Act" or a use which is included in specified drug compendia. § 1396r-8(k)(6). *See also* § 1396r-8(g)(1)(B)(i) (identifying compendia to be consulted).[3]

In addition to harmonizing the FDA's regulation of the pharmaceutical industry with the federal government's expenditures for prescription drugs, Congress enacted these restrictions in 1990 for two other important purposes. With projections of federal Medicaid payments for prescription drugs exceeding $2.8 billion in fiscal year 1991, Congress sought to "achieve savings by reforming the purchase of prescription drugs." H.R. Rep. No. 101-881, at 64, 96 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2076, 2108. Plainly, refusal to pay for drug uses that had not been proven safe and effective would result in reduced cost with minimal adverse effect on patient care. Second, the statute also sought to assure that "prescriptions written for Medicaid beneficiaries are appropriate and medically necessary." *Id.* at 2110. Again, refusal to pay for non-recognized drug uses would also achieve this important goal.

Thus, the relevant regulatory schemes, the statutory language and the legislative history make it apparent Medicaid's payment of claims for *off-label* prescription drugs can constitute "false claims" for the purpose of 31 U.S.C. § 3729. All that remains is for the Relator to allege sufficient facts to state a claim that the defendant has caused such false claims to be presented.

---

or has been granted exemption by the Secretary. Thus, although, Congress created this exception for certain categories of drugs, it is significant that neither Neurontin nor Accupril qualify.

[3] At the time this lawsuit was brought, § 1396r-8(g)(1)(B)(i) referenced only three compendia, the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information and the American Medical Association Drug Evaluations. None of these compendia cite *off-label* uses for Neurontin or Accupril. Complaint, ¶ 11. In 1997, the statute was amended to include a fourth compendium, the DRUGDEX Information System.

The Complaint, and the accompanying Disclosure of Information By Relator David P. Franklin Pursuant To 31 U.S.C. § 3730b(2)(the "Disclosure"), contain such allegations.

### B. Parke-Davis's Illegal Promotional Practices Caused the Government To Either Reimburse Or Pay the Cost Of *Off-Label* Neurontin And Accupril Prescriptions

According to the Complaint, Parke-Davis formed a scheme to market Neurontin and Accupril for *off-label* uses to boost sales of these drugs while avoiding the expense and delay of petitioning the FDA for approval of those uses. Complaint, ¶ 8. The scheme knowingly exploited a loop-hole in Medicaid enforcement. Although the various states' Medicaid programs did not intend to cover drug prescriptions for uses that were not "medically accepted indications," the states' enforcement divisions have no way of determining whether or not the prescription has been written for an appropriate use. Complaint, ¶ 24. Parke-Davis's unlawful promotion of its prescription drugs led to extensive *off-label* prescriptions paid for by the federal government, Complaint, ¶ 10, but without anyone having the ability to halt inappropriate prescriptions. The allegations set forth in the Complaint and Disclosure describe the tools, methods and means that Defendant Parke-Davis employed to execute its scheme. The details of the scheme, Complaint, ¶ 9, including cash payments and gifts paid to physicians, are summarized as follows:

1. Use of Medical Liaisons to "cold-call" physicians and promote *off-label* uses of Neurontin and Accupril for the purpose of inducing them to prescribe *off-label*;

2. Medical Liaison's unsolicited use of non-scientific literature, and other enduring materials, describing *off-label* uses of Neurontin during "cold-call" visits with physicians;

3. Making payments to physicians disguised as fees for participation in "preceptorships," "speakers bureau," "dinner programs," "consultantships," "record reviews," "case studies," and "teleconferences" for the sole purpose of inducing physicians to write prescriptions for and promote to other physicians, both approved and *off-label* uses of Neurontin and Accupril;

4. Use of Precision Marketing Data to identify physicians of varied specialties (psychiatrists, pediatricians, neurologists, orthopedic surgeons, etc.) with large volume practices, who were not using Neurontin, as targets for cold call visits to promote *off-label* uses of Neurontin;

5. Monitoring the progress of the *off-label* promotion program (and the return on Defendant's investment in the program, including the use of Medical Liaisons) by using sophisticated computer data that identified physicians by zip code and listed all drugs they prescribed, including Neurontin and Accupril. Defendant used this data to track the new prescriptions for Neurontin and Accupril that were generated after the Medical Liaison's "cold call" visit. This same data was used to track new prescriptions for Neurontin and Accupril following a physician's attendance at CME programs or promotional symposiums in which *off-label* uses of Neurontin and Accupril were promoted;

6. Engaging in marketing pre-FDA approval by casually mentioning the results of clinical trials that were underway;

7. Awarding Olympic tickets to the physicians that wrote the largest numbers of Neurontin or Accupril prescriptions for *off-label* uses.[4]

---

[4] *See* Department of Health and Human Services: Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65,372, 65,376 (1994), (stating that a payment or gift may be considered improper under 42 U.S.C. § 1329a-7b(b) if

All of these practices were intended to cause physicians to write prescriptions for *off-label* uses that Defendant knew were not for "medically accepted indications" as defined in 42 U.S.C. § 1396r-8(k)(2) and (3), consequently, not eligible for reimbursement under the Medicaid program. Complaint, ¶¶ 11, 23. The Complaint alleges that 50% of defendant's *off-label* sales were paid for directly or indirectly by the United States at a cost of between $30-$40 million per year. Complaint, ¶ 10. Indeed, this court can take judicial notice that in other federal litigation defendant has claimed that 78% of its Neurontin prescriptions are for *off-label* use.[5]

## ARGUMENT

### I.    CAUSING THE FILING OF FALSE MEDICAID CLAIMS IS ACTIONABLE UNDER THE FALSE CLAIMS ACT

Defendant Parke-Davis seeks to dismiss Relator's claim by recharacterizing the allegations in the complaint.[6] Ignoring the multitude of allegations that allege that Parke-Davis's actions caused the U.S. Government to pay claims that should have never been presented, e.g. Complaint, ¶¶ 10, 11, 14, 22-30, 37-38, Parke-Davis contends that the Relator is attempting to bring a private enforcement action under the Federal Food, Drug and Cosmetics Act. Parke-Davis is correct that no private right of action exists under that Act, but nothing in the False Claims Act prevents the United States (or the Relator in the name of the United States) from prosecuting false claims which are premised on money improperly paid by the United States as a result of the wrongful promotion of *off-label* claims. In other words, although Relator has not

---

it is: (1) made to a person in a position to generate business for the paying party; (2) related to the volume of business generated; and (3) more than nominal in value and/or exceeds fair market value of any legitimate service rendered to the payor, or is unrelated to any service at all, other than the referral of patients).

[5] *See* Memorandum In Support Of Plaintiff's Motion To Dismiss Third Through Fifth Counts Of Defendant's Counterclaim at 5, *Warner-Lambert Company, v. Purepac Pharmaceutical Co. and Faulding Inc.* , C.A. No. 99-5948 JCL (D.N.J. filed Dec. 20, 1999).

[6] The Relator will voluntarily dismiss counts VII and VIII of the Complaint.

stated a claim against Parke-Davis under the False Claims Act when he merely alleges that Parke-Davis violated the *off-label* marketing requirements of the Food Drug and Cosmetic Act, he does state a claim when he alleges that Parke Davis's illegal, *off-label*, promotional activities resulted in the payment of claims that should have never been submitted to Medicaid.

As demonstrated in Section I.A. *infra,* the Medicaid program, which is federally financed, does not cover *off-label* uses which fail to meet the definition of "medically accepted indication." 42 U.S.C. §1396r-8(k)(6).  The Relator alleges that Parke-Davis, through its *off-label* promotion, knowingly caused prescriptions to be submitted for federal reimbursement which were not for "medically accepted indications."  Complaint, ¶¶ 11, 23-26.  Assuming the allegations are true, which this court must for the purpose of a Rule 12(b)(6) motion, Relator has stated a claim that Parke-Davis caused a false or fraudulent claim to be presented for payment or approval in violation of 31 U.S.C. § 3729(a)(1).  No more need be stated.

Intentionally causing the submission of false Medicaid claims, Counts II and IV of the Complaint, however, are not the only actionable claims alleged by Relator.  The False Claims Act also covers fraud in the inducement claims—claims where a government payment was caused by a false statement or fraudulent conduct.  *United States ex. rel. Marcus v. Hess,* 317 U.S. 537, 543-44 (1943)(payments under government contract that was executed as a result of collusive bid constituted actionable false claims); *Harrison v. Westinghouse Savannah River Co.* 176 F.3d 776, 787-88, 791-92 (4th Cir., 1999)(payments for contract entered into as a result of misrepresentations regarding expected costs and work that needed to be performed constituted false claims). Straightforward fraud-in-the-inducement claims are also alleged in the Relator's Complaint.

8

In Counts I and V of the Complaint, Relator alleges that in order to induce physicians to write prescriptions that were to be paid directly by the United States—such as through drug purchases by the Veteran's Administration—Parke-Davis's special sales division made false statements about the efficacy and safety of Neurontin and Accupril. In particular, Parke-Davis personnel misrepresented the scientific evidence that the drugs could be safely or effectively used for uses other than those approved by the FDA. Complaint, ¶¶ 12, 14-15, 30-32. According to the Complaint, had these false representations not been made, the prescriptions would not have issued and the United States would not have purchased the drugs. Such conduct constitutes the knowing use of a false statement to get a false claim paid by the Government in violation of 31 U.S.C. § 3729(2)(2).

A third category of cognizable false claims that have been broadly recognized in the federal courts—false certification of compliance—has also been alleged in the Complaint. Under this False Claim theory, an actionable false claim exists when a government program requires compliance with certain conditions as a prerequisite to receipt of a government benefit, the defendant failed to meet those conditions, and the defendant falsely certified that it had complied. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d at 786-87 (4th Cir. 1999); *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). Moreover, there need not be an explicit certification for compliance for a false claim to exist. This Court and others have recognized that when the Government would have never paid the submitted claims had it known about the material non-compliance, submission of the claim constitutes an implied certification. In Judge O'Toole's words, "Submitting a claim under the false pretense of entitlement is fraudulent." *United States ex. rel. Kneepkins v. Gambro Healthcare, Inc.*, No. Civ. A. 97-10400, 2000 U.S. Dist. LEXIS 10424, at *21 (D. Mass. Jul. 18,

9

2000) (submission of claim to Medicare constituted an implied certification that treatment was "provided economically" and that there was no violation of Medicare/Medicaid Anti-Kickback law). *See also United States ex. rel. Pogue v. American Healthcorp, Inc.*, 914 F. Supp. 1507, 1513 (M.D. Tenn. 1996)(" the False Claims Act was intended to govern not only fraudulent acts that create a loss to the government but also those fraudulent acts that cause the government to pay out sums of money to claimants it did not intend to benefit"; court found filing claim constitutes implied certification of compliance with Medicaid Anti-Kickback provisions); *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994) (implied certification of compliance with affirmative action requirements).

Two of the counts of Relator's Complaint constitute valid false certification claims. Count V, "Illegal Kickbacks", alleges that Parke-Davis's violations of the Medicaid Anti-Kickback provisions, 42 U.S.C. § 1320a-7b(b), [7] caused false claims to be filed. Paragraphs 24 through 26 allege that Parke-Davis gave Medicaid and Medicare providers cash payments, travel benefits, entertainment and even Olympic tickets as a reward for writing prescriptions for its products, notwithstanding the prohibition of offering, paying or receiving items of value in exchange for arranging the purchase of any good that is paid for (in whole or in part) by the federal government. It is now well established that allegations of violations of the Anti-Kickback law state causes of action under the False Claims Act. *See Thompson*, 125 F.3d at 902; *Kneepkins*, 2000 U.S. Dist. LEXIS 10424, at *21-22; *Gublo v. NovaCare, Inc.*, 62 F. Supp. 2d 347, 355 (D. Mass. 1999); *Pogue*, 914 F. Supp. at 1513; *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504, 1506 (S.D. Ohio 1994). Thus, Count V plainly states a cause of action.

Count III, Experimental Use of Drug, is also an improper certification claim. Paragraph 21 alleges that Parke-Davis embarked on a national program of experimentation with Neurontin,

---

[7] Paragraph 27 of the Complaint incorrectly cites to 42 U.S.C. § 1320a-7.

encouraging physicians to prescribe it *off-label* to develop data that Parke-Davis could later submit to the FDA to demonstrate Neurontin's safety and effectiveness. This course of action, of course, turned the normal regulatory scheme for prescription drugs on its head. Drug companies are supposed to develop safety and effectiveness data *before* a drug is widely prescribed. Indeed, the Food and Drug Adminstration strictly regulates investigational drug studies on human subjects pursuant to its IND (Investigational New Drug) program. *See* 21 U.S.C. § 355(i); 21 CFR § 312 *et seq.*

Pursuant to the FDA's IND regulations, any time a drug is used as part of an experiment on human subjects, the drug is considered to be an investigational new drug and approval for the experiment, which is called a clinical investigation under the regulations, must be obtained from the FDA. 21 CFR §§ 312.3 (definitions of clinical investigation and Investigational New Drug), 312.20 (requirements for an IND). Moreover, as noted in the Complaint, ¶ 20, any drug company sponsoring research on an investigational new drug may not commercially distribute the drug, and may not even charge for the drug without the written approval of the FDA. 21 CFR §§ 312.7 (b), (d).

The Complaint alleges that Parke-Davis violated both the prior experimental approval and the price control regulations, and compounded those violations by causing the federal government to pay for prescriptions for which it could not be legally charged. Complaint, ¶¶ 21, 22. By causing the federal government to pay for drugs that were part of an illegal experiment, Parke-Davis plainly caused the payment of false claims. First, as noted above, the federal government does not pay for drugs for non-medically acceptable indications. Moreover, the claims submitted to the government implicitly certified that the prescribed drugs could be legally sold. Surely Medicaid would have rejected the claims had it been informed that the prescribed

drugs could not be commercially distributed or even sold by the manufacturer. Parke-Davis solicited the submission of prescriptions that it knew would be submitted under a false pretense of entitlement—the prescriptions could not be legally paid for by the Government. Causing submission of such false claims is a violation of 31 U.S.C. § 3929.

## II.   RELATOR'S COMPLAINT AND DISCLOSURE MEET THE SPECIFICITY REQUIREMENTS OF FED. R. CIV. P. 9(b)

### A.   Rule 9(b)'s Particularity Requirements Are Relaxed When The Details Of The Fraud Are Within The Exclusive Possession Of The Defendant And When It Is Impractical To Provide Such Specification Due To The Multitude of Fraudulent Claims Involved

Fed. R. Civ. P. 9(b), which requires the circumstances constituting a fraud to be stated with particularity, applies to *qui tam* actions brought under the False Claims Act. *Gold v. Morrison-Knudsen* Co., 68 F.3d 1475, 1476-77 (2d Cir. 1995). Contrary to Parke-Davis's assertion, however, the First Circuit has recognized that when Rule 9(b) is harmonized with Rule 8, the pleading of "evidence and detailed facts are not required." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Ordinarily, all that is required is a "specification of the time, place and content of an alleged false representation." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999); *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991).

Certain circumstances, which are present in this case, however, permit the relaxation of Rule 9(b)'s requirements. When the facts concerning a plaintiff's allegations of fraud are peculiarly within the defendant's control, less specificity of pleading is required pending discovery. *Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 866 (1st Cir. 1993); *United States Ex. Rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (*Thompson I*); *see also United States Ex. Rel. Thompson v. Columbia/HCA*

*Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998) (*Thompson II*). This exception to the particularity requirement exists where the plaintiff cannot be expected to have personal knowledge of the facts constituting the wrongdoing. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987). Indeed, the First Circuit recognizes that courts cannot expect plaintiffs to plead "fraud with complete insight" before discovery is completed, *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996), and that in such cases discovery should be permitted before requiring plaintiff to plead individual acts of fraud with particularity. *Boston & Maine Corp. v. Town of Hampden*, 787 F.2d at 866.[8] Where the details are within the possession of the defendant, the plaintiff may plead on information and belief so long as the factual basis of such belief is provided.

Specification of each instance of fraudulent conduct is also not required where it would be impractical to provide such information, such as in cases like this one that involve hundreds of instances of fraudulent conduct. *SEC v. United States Environmental, Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000); *Pierce v. Apple Valley, Inc.*, 597 F. Supp. 1480, 1492 (S.D. Ohio 1984). Where allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to satisfy Rule 9(b). *Thompson II*, 20 F. Supp. 2d at 1039; *Fujisawa Pharmaceutical Co. v. Kapoor*, 814 F. Supp. 720, 726 (N.D. Ill. 1993); *Sunbird Air Services, Inc. v. Beech Aircraft Corp.*, 789 F. Supp. 364, 366 (D. Kan. 1992). Indeed, to require the specifics for each transaction is unduly burdensome in such cases and at odds with the spirit of the federal rules. *General Motors Corp. v. Johnson Matthey, Inc.*, 855 F. Supp.

---

[8] Indeed, the requirement of particularity should be excused entirely when this information is in the possession of a defendant who has resisted attempts at discovery. *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998). This has plainly occurred in this case. In response to Plaintiff's First Request for Production of Documents, Parke-Davis refused to produce a single document, primarily on frivolous grounds of relevancy. Plainly, Parke-Davis cannot claim that plaintiff has failed to provide specifics about the instances of fraud and then prevent plaintiff from obtaining access to the data that would allow him to provide the information Parke-Davis demands.

1005, 1007 (E.D. Wis. 1994); *Vaccariello v. Financial Partners Brokerage, Ltd.*, No. 82 C. 5910, 1983 U.S. Dist. LEXIS 15041, *5-6 (N.D. Ill. Jul. 29, 1983). This exception is necessary to prevent sophisticated perpetrators of fraud from using Rule 9(b) as a shield for their wrongdoing. *See e.g., Levine v. Metal Recovery Technologies, Inc.* 182 F.R.D. 102 (D. Del. 1988).

Perhaps the best example of how the specificity requirements are applied in a false claim action that concerns thousands of improper Medicare or Medicaid claims is *Thompson II*, 20 F. Supp. 2d at 1049, the District Court remand after *Thompson I* permitted violations of the Medicare/Medicaid Anti-Kickback Act to be prosecuted as false claims. There the Court found that so long as the basic framework, procedures and nature of the fraudulent claims and the financial arrangements and inducements among the defendants had been pled with specificity, there was no need to require the plaintiff to list each and every false claim, the dates of the claim, the individuals responsible and why each transaction was not eligible for medicare coverage. *Thompson II* is the model of what should be disclosed in a *qui tam* action involving hundreds of transactions and the Court intelligently recognized the difference between providing evidentiary detail and providing sufficient information to allow the defendant to respond to the plaintiff's allegations. Only the latter is required. And, as will be demonstrated below, the Relator has met the appropriate standard.

**B.    The Factual Allegations In The Complaint And The Disclosure Provide Sufficient Particularity for Each of the Counts in the Complaint**

The 38 paragraphs of the Complaint do not provide extensive detail concerning the alleged fraudulent conduct. Paragraph 5 of the Complaint, however, incorporates by reference Relator's written disclosure pursuant to 31 U.S.C. § 3730(2) and a copy of the Disclosure was provided to Parke-Davis. The Disclosure, a copy of which is attached as Exhibit A, is a thirty-

one page, single-spaced document accompanied by hundreds of pages of exhibits (including 196 pages of taped transcripts). It contains extensive detail regarding the fraudulent conduct alleged, the persons who made the misrepresentations, the persons to whom the misrepresentations were made, when the fraudulent conduct occurred and the factual basis for Relator's allegations that the conduct caused false claims (principally *off-label* prescriptions for Neurontin and Accurpril) to be submitted.

Even if one assumes that the allegations in the Complaint do not meet the Rule 9(b) specificity requirements, the standard has been more than met by the specific information contained in the Disclosure and its exhibits.[9] Below, Relator will briefly demonstrate how the facts set forth in the Disclosure satisfy the particularity requirements.

### (1)    Counts I and V - Direct Sales to Veterans Administration And False Statements to Doctors

As noted above, these counts are premised upon false statements concerning Neurontin and Accurpril made to physicians and persons within the Veterans Administration in order to induce them to purchase these drugs with federal funds. Pages 21 through 29 of the Disclosure describe numerous false statements routinely made by Parke-Davis's employees, including the Relator, regarding *off-label* uses of Neurontin and Accurpril. Parke-Davis's salespersons and Medical Liaisons routinely exaggerated, and sometimes outright fabricated, the scientific evidence regarding Neurontin's effectiveness on conditions as diverse as pain management, migraine headaches, bi-polar disorder and even attention deficit disorder. For many of these

---

[9] The specification requirement does not always have to be satisfied by allegations contained in the complaint. In *United States ex. rel. Kneepkins v. Gambro Healthcare, Inc.*, No. Civ. A. 97-10400, 2000 U.S. Dist. LEXIS 10424, at *25-26 (D. Mass. Jul. 18, 2000), Judge O'Toole held that the specification requirements could be satisfied by the Government's provision of a computerized list to the defendants. It does not appear that the Court required the list to be part of an amended complaint.

Nonetheless, if the Court requires the factual basis of Relator's allegations to be included within the Complaint, the Relator can easily amend his Complaint to incorporate the necessary facts, and leave to amend should be permitted. *See* Section II.C. *infra*.

conditions, Parke-Davis personnel informed the doctors that positive treatment results were confirmed by clinical trials, when in fact no such studies had been performed and Parke-Davis did not possess such data. In other cases, Parke-Davis personnel intentionally misrepresented anecdotal reports as approved clinical studies. Effectiveness rates were also fabricated. For example, Parke-Davis claimed that it had a 90% effectiveness rate for *off-label* indications such as pain management and post-herpetic neuralgia, when Parke-Davis possessed no such data. It also claimed that patients using its coronary medication, Accurpril would have fewer heart attacks, require fewer procedures and live longer than patients on comparable medicines. Yet no scientific data supported these assertions. The specific misstatements regarding each of the 12 *off-label* indications promoted by Parke-Davis are set forth in more detail in the Disclosure.

The Disclosure also identifies persons who made these statements, some of the doctors to whom they were made as well as the time period when they were made. Relator cannot, of course, identify each and every Parke-Davis employee who made such statements and the times and places that the statements were repeated. This information, of course, is in the exclusive possession of Parke-Davis and even it were available, it would be impractical and burdensome to identify each and every occasion. Accordingly, Relator is not required to provide such detail. Yet the Disclosure provides the factual basis for the Relator's allegations that such representations were made. Relator describes that he and others were trained to make these representations pursuant to company policy created by high-level personnel. *See* Disclosure pp. 10-18.

On pages 28-29 of the Disclosure, Relator specifically identifies the Parke-Davis employee who was responsible for sales to the Veterans Administration and who confirmed that representations similar to those made to individual physicians were made to the VA, including

false information concerning the evidence proving Neurontin's effectiveness for pain and psychiatric disorders. Additionally, Relator provides the factual basis for his allegation that such promotion lead to the U.S. Government's purchase of Neurontin, a personal report from a VA pharmacist who expressed concern for the growing off-label prescriptions for Neurontin that he was required to fill. Disclosure, at 29.

Parke-Davis asserts that the Relator fails to provide any factual allegations regarding the nexus between its conduct and the federal government's purchase of Neurontin, and that the Complaint does not identify a single claim submitted to the Government for reimbursement. *Thompson II* makes it plain that Relator is not required to provide such detailed information. "Plaintiffs are entitled to discovery before being required to list every false claim, its date, the individuals responsible and why each patient was not eligible for Medicare." 20 F. Supp. 2d at 1049. Moreover, specific facts concerning increased sales of Neurontin as a result of contacts with Parke-Davis's sales force is information within the control of the defendant. Plaintiff, however, has plainly provided a factual basis for his allegation that such contacts did increase sales, including transcripts of marketing officials congratulating the Medical Liasons for the increased Accupril and Neurontin sales. Disclosure, Exhibit A, pp.1-59, 1-94 through 1-95, 1-134 through 1-135, 1-157 through 1-159. Moreover, unlike the false claims which were rejected in *United States ex. rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147-48 (D. Mass. 2000) and *Gublo v. NovaCare*, 62 F. Supp. 2d 347, 354 (D. Mass. 1999), Relator here does provide substantially more than a hypothetical or speculative theory of how the United States could have been defrauded. The facts alleged in the disclosure and the reasonable inferences therefrom leave little doubt that the federal government did purchase Neurontin as a result of the allegedly fraudulent communications. And unlike *Gublo,* here the Relator has provided the

17

"who, what, when, where, and how" of the "observations and conversations" that are the basis of his conclusion that fraud has occurred. This constitutes a sufficient allegation of fraud for Rule 9(b) purposes.

### (2)  Counts II and IV - Medicare And Medicaid Financed Sales And Violating State Formularies/Medicare and Medicaid

Neurontin was only approved by the FDA and as an adjunct therapy for epilepsy.[10] Yet, the Disclosure leaves no doubt that Parke-Davis intended to promote Neurontin for almost everything but adjunctive therapy. A senior marketing official at Parke-Davis on April 22, 1996, provided the following instruction which exemplifies the defendant's *off-label* promotional program:

> I want you out there every day selling Neurontin. Look this isn't just me, its comes down from Morris Plains [headquarters of Warner-Lambert, Parke-Davis's corporate parent] that Neurontin is more profitable than Accurpril so we need to focus on Neurontin. . . We all know Neurontin is not growing for adjunctive therapy, besides that's not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody. . . That's where we need to be, holding their hand and whispering in their ear, Neurontin for pain, Neurontin for monotherapy, Neurontin for bi-polar, Neurontin for everything. . . I don't want to see a single patient coming off Neurontin before they have been up at least 4800mg /day.[11] I don't want to hear that safety crap either.

Disclosure at 11.

The Disclosure identifies numerous individuals who promoted Neurontin based on exhortations similar to the one quoted above. The exhibits to the Disclosure identify dozens of doctors who received these sales pitches. The Disclosure also provides specific information

---

[10] Adjunctive therapy is the use of Neurontin in connection with another approved medication for epilepsy. Monotherapy is the use of a single medication for treatment. Neurontin was not approved by the FDA for monotherapy and has not been found to be safe or effective for such treatment.

[11] Neurontin has only been approved safe and effective by the FDA up to 1800 mg per day.

regarding Parke-Davis's knowledge that reimbursement could be denied for *off-label* uses and that it intentionally developed strategies to avoid this from occurring.  Disclosure, Exhibit A, at page 169-170.

Although the Disclosure and its exhibits, particularly the transcripts of the telephone messages, identify several doctors who increased their prescriptions as a result of Parke-Davis' promotion of *off-label* uses, it does not, and can not, specifically identify prescriptions paid for by Medicaid.  No one, in fact, could identify such prescriptions without knowing all the doctors to whom Parke-Davis promoted *off-label* uses. Relator, however, has plainly provided the factual basis for his belief that such promotional activities caused Medicaid to pay *off-label* prescriptions of Neurontin, including the fact that these efforts greatly increased Neurontin's sales, most providers approached by Parke-Davis personnel participated in the Medicaid program and Parke-Davis took no action to make sure the physicians who had been solicited did not write *off-label* prescriptions for Medicaid patients.[12]

Moreover, as *Thompson II* makes clear, details regarding the specific claims submitted to Medicaid are not necessary in order for Parke-Davis to prepare a response to Relator's Complaint.  Indeed, provision of this information at the pleading stage would be unduly burdensome. If, however, the Court believes such evidentiary detail should be provided at the pleading stage, Relator, with the assistance of the Health Care Financing Administration and information obtained from the States' Medicaid programs can identify, by doctor, pharmacist, and date of the claim, each *off-label* prescription which should not have been paid. Relator should be granted leave to amend the complaint to provide this information if the Court finds it is required by Rule 9(b).

---

[12] To the extent these facts are not explicitly contained in the Complaint or the Disclosure, this deficiency can be cured by an amendment.

### (3)    Count III - Experimental Use of Drug

Pages 29 and 30 of the Disclosure describe a policy implemented by senior marketing officials at Parke-Davis to experiment with Neurontin's effects on neurological conditions with human subjects. The company's officials justified this position on their unproven belief that the drug was safe in high doses and did not appear to have serious drug interactions. Medical liaisons and salespersons were instructed to convince physicians to experiment with the drug to see what happens, and to write up the results (if they were favorable) for case studies that would be used to further promote *off-label* uses. As noted above in Section I, FDA regulations prohibit commercial distribution of drugs for experimental purposes and the federal government should have never paid for such use.

The Disclosure specifically identifies the nature of the experiments, the persons involved in the experiments and the Parke-Davis personnel who caused such experimentation to occur. Neither the Complaint nor the Disclosure specifically identifies which experimental treatments were paid for by the federal government, but the Relator could not be expected to have such information, which is in the possession of third parties. Relator, however, has given sufficient factual support for his belief that federal government did pay for some of the experimentation, namely the large volume of Neurontin prescriptions paid by the federal government.[13] If this is not clearly enough stated in the Complaint or Disclosure, Relator should be given leave to amend to include further detail.

---

[13] In 1996 alone, Medicaid paid more than 300,000 claims for Neurontin prescriptions.

### (4)   Count V - Illegal Kick Backs

Factual allegations concerning Parke-Davis' violation of the Medicare/Medicaid Anti-Kickback laws are contained in the Disclosure at pp. 18-21, and Exhibit A to the Disclosure, pp. 1-20 through 1-24, and 1-54 through 1-59. These portions of the Disclosure describe payments to doctors who extensively prescribed Parke-Davis drugs. Parke-Davis sales representatives selected such physicians to become "consultants" or receive Olympic tickets as a reward for writing large amounts of prescriptions.

The Disclosure identifies the Parke-Davis personnel who rewarded physicians for their prescription writing activity and identifies at least one doctor (Dr. Cherbanian) who received Olympic tickets. Disclosure, Exhibit A, pp. 1-21. Neither the Complaint or the Disclosure identify specific Medicare or Medicaid claims placed after the physicians had received kickbacks, but these can easily be established once the doctors are identified because most physicians participate in Medicare and/or Medicaid. If necessary, plaintiff can amend to provide the details.

### (5)   Count IX - Accupril

Although Relator's Complaint contains a separate count relating to Accupril, the Disclosure makes it clear that the same type of misconduct with regard to Neurontin occurred with Accupril, a coronary heart disease drug. Pages 27 and 28 of the Disclosure describe false statements regarding Accupril, including misstatements of the results of clinical trials surrounding the drug. Personnel at Parke-Davis were trained to inform physicians that clinical tests proved that Accupril lengthened the patient's life by reversing coronary artery disease when, in fact, there was no evidence to support such claims and long term studies had not even been conducted. The Disclosure adequately provides the identity of the persons who made false

claims about Accupril, the persons who marketed Accupril *off-label*, the persons to whom it was marketed to, and when the disclosures were made. For the reasons set forth above, such factual disclosures are sufficient for the purposes of Rule 9(b).

**C.      Relator Should Be Given Leave To Amend His Complaint To Add Greater Specificity, If Necessary**

If the Court determines that the circumstances of fraud have not been alleged with sufficient particularity, Relator should be given leave to file an Amended Complaint. Indeed, an Amended Complaint would be appropriate given that Relator's legal theories have evolved since the Complaint's initial filing and additional information regarding the false claims caused by Parke-Davis has become available since the filing. Although the Compliant was originally filed in August 1996, the Court must recall that it was not served upon defendant until May 2000 because of the United States's investigation of the Relator's claims. If there are defects in the Relator's pleading, he should be given at least one opportunity to correct them.

Under Rule 12(b)(6), this Court should not dismiss the Complaint unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Hishon v. King & Spaulding*, 467 U.S. 69 (1994); *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). Further, Fed. R. Civ. P. 15 provides that leave to amend a complaint should be freely given when justice requires. Where the plaintiff has at least colorable grounds for relief, justice ordinarily requires this Court to grant plaintiff leave to amend his complaint before a dismissal occurs. *Williams v. Astra USA, Inc.*, 68 F. Supp. 2d 29, 33 (D. Mass. 1999). As has been demonstrated, if factual details have been omitted, they can be provided in an amendment. Consequently, if this Court finds that the complaint fails to meet the requirements of Rule 9(b), leave to file an amended complaint should be granted.

22

## CONCLUSION

WHEREFORE, for the reasons set forth above Defendant's Motion to Dismiss should be denied, or in the alternative, Relator David Franklin should be granted leave to file an amended complaint to correct any deficiencies found by the Court.

By his attorneys,

Dated: October 12, 2000

Thomas M. Greene, Esquire
BBO # 210020
Greene & Hoffman, P.C.
125 Summer Street, 14th floor
Boston, MA  02110
Telephone (617) 261-0040
Facsimile  (617) 261-3558